# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| **Christopher H. Zoukis,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | 1:14cv1041 (LMB/IDD) |
| ) | |
| **Eric D. Wilson, et al.,** ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Christopher Zoukis, a federal inmate confined in Virginia and proceeding pro se, has filed this action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) and the Rehabilitation Act, 29 U.S.C. § 791 et seq. In this action, he alleges that the defendants, Eric D. Wilson, Warden of FCI Petersburg ("Petersburg"); Charles E. Samuels, Jr., Director of the Federal Bureau of Prisons ("BOP"); Dr. Corine Hill, former Petersburg psychologist; Dr. Amy Boncher, former chief psychologist at Petersburg; Dr. Katherine Laybourn, medical director at Petersburg; Harrell Watts, BOP National Appeals Coordinator; and Christopher Eichenlaub, BOP Mid-Atlantic Regional Director, have violated his rights by failing to provide adequate treatment for his Attention Deficit and Hyperactivity Disorder ("ADHD"). Each defendant is sued in his or her official and individual capacity.

On February 13, 2015, defendants filed a Motion to Dismiss and for Summary Judgment, accompanied by a supporting memorandum and exhibits. See Dkt. Nos. 22, 23. After being given the opportunity to file responsive materials in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1997) and Local Rule 7(K), plaintiff filed a response on May 15, 2015. Dkt. No. 31. Defendants filed a reply on May 28, 2015. Dkt. No. 34. Plaintiff has also filed a "Motion to Stay Ruling and for Order Allowing Prisoner to Prisoner Communication," in which he appears to ask for an extension of time to file a sur-reply to the defendant's reply. For the reasons

that follow, defendants' Motion to Dismiss and Motion for Summary Judgment will be granted, and plaintiff's Motion will be denied.

## I. Background

Plaintiff's complaint centers on the BOP's failure to prescribe him medication for his ADHD. The BOP maintains a list of medications that medical practitioners can routinely prescribe to inmates without further approval. This list is known as the "National Formulary." See Memorandum of Law in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Defs.' Mem.") [Dkt. 23], Ex. 4 (Lewis Decl.) ¶ 2. Inmates may be prescribed medications that are not on the National Formulary after a medical practitioner obtains approval from the institution's pharmacist, the facility's clinical director, the regional pharmacist, and finally the BOP's chief psychiatrist or medical director. See id. ¶ 3. The National Formulary also provides a list of pre-requisites for each specific non-formulary drug. Id. ¶ 4. Drugs used for treatment of ADHD, such as Adderall and Strattera,[1] are non-formulary drugs due to their highly addictive properties. Id. ¶ 5. As pre-requisites for obtaining approval of these drugs, a medical practitioner must certify and submit written evidence that (1) a prisoner has attempted to manage his symptoms with counseling and coping mechanisms for six months with no success, and (2) a prisoner has tried "noradrenergic re-uptake inhibitor" medication for six weeks with no success. See Defs.' Mem., Ex. 5, at unnumbered page 4.

Plaintiff is confined to Petersburg serving a 151-month sentence after being convicted in 2008 of possession of child pornography. See Am. Compl. [Dkt. No. 2] ¶¶ 11-12; United States v. Zoukis, No. 1:07-cr-91, Dkt. No. 20 (W.D.N.C. Sept. 28, 2008). While incarcerated at Petersburg, plaintiff has written two books, completed his paralegal degree, and authored several internet blogs. See Defs.' Mem., at 2 ¶ 2. Before his incarceration, plaintiff suffered from

---

[1] Plaintiff states that Adderall is a "stimulant" and Strattera is a "non-stimulant." See Am. Compl. ¶ 25.

2

ADHD and received various forms of treatment, including medication and therapy, with varying degrees of success. See Am. Compl. ¶¶ 14, 19-25. His Pre-Sentence Report extensively documented his struggles and treatment. See Plaintiff's Reply to Defendants' Motion to Dismiss and for Summary Judgment ("Pl.'s Reply") [Dkt. 31], Ex. 1 (Zoukis Aff.) ¶¶ 5-7.

When plaintiff arrived at Petersburg, he was receiving only 40 mg of fluoxetine (Prozac) daily, Motrin, and vitamins. See Defs.' Mem., Ex. 1 [Dkt. 23-1], at unnumbered page 1.[2] In response to a questionnaire regarding medical treatment, plaintiff listed "depression and anxiety" as his only previous mental illnesses. Id. at 4. BOP medical staff thus continued his fluoxetine prescription, id. at 7, 11.[3] Plaintiff continued taking his fluoxetine until January 12, 2009, when he voluntarily stopped taking the medication. Id. at 29 (showing plaintiff's signature on a refusal of medical treatment form).

On February 25, 2009, plaintiff reported feeling "irritable" without any medication, so Dr. Rice wrote plaintiff a prescription for 25 mg of sertraline, a different anti-depressant. Id. at 31-33. On April 8, 2009, plaintiff returned to Dr. Rice and requested a higher dosage of the sertraline. Id. at 34. After Rice doubled the dosage, plaintiff reported that the medication "was working well for him," and that he was able to focus on his various activities, such as obtaining his paralegal degree. Id. at 38.

Plaintiff apparently discontinued his sertraline approximately six months later. Id. at 43. On April 29, 2010, he informed another medical staff member that he wanted to re-start taking medication due to "occasional anxiety attack[s]." Id. Plaintiff was prescribed 5 mg of buspirone twice daily. Id. at 44. Plaintiff did not report any complaints with this medication. See Defs.'

---

[2] Defendant's Exhibit 1 consists of plaintiff's medical records. The pages have not been separately numbered. Accordingly, all pages cited refer to the unnumbered page.
[3] At Petersburg, psychologists are licensed to provide only behavioral therapy. They cannot prescribe medication. See Defs.' Mem., Ex. 8 (Hill Aff.) ¶¶ 1, 8.

3

Mem., Ex. 1 cont. [Dkt. 23-6], at ECF page 3.[4] He stopped taking this medication during June and July of 2010. Id. at 7. In response to questions from medical staff, plaintiff stated that he understood the risks of stopping the medication and agreed to start again in the future if he found it necessary. Id. at 7-9.

Plaintiff voluntarily remained medication-free through at least May of 2012, and did not report any problems to medical staff that would require medication. See id. at 14 (at a June 1, 2011 appointment, plaintiff was "not on any medications"); 18 ("not on any medications" at a November 22, 2011 appointment); 20 ("not taking medication about a year" on February 28, 2012); 25 (on May 21, 2012, doctor notes "he used to take meds for depression and has stopped meds for a long time."). Plaintiff met with psychology staff for various routine appointments between 2008 and 2012, and also reported no problems. See, e.g., Defs.' Mem., Ex. 2, at unnumbered pages 6-8.[5] Between February 22, 2012 and June 26, 2012, plaintiff received monthly psychological assessments during his time in disciplinary segregation. During each assessment, psychology staff reported him to be mentally healthy. Id. at 9-13.

In July of 2013, plaintiff requested to meet with a psychologist. On July 30, 2013, he met with Dr. Corine Hill, and indicated that, due to his ADHD, he was having trouble concentrating on his studies in his housing unit. Id. at 14. At this appointment, he stated that "he had recently met with Health Services and had been informed that he needed to meet with psychological services in order to see about obtaining medication for ADHD." Id. He requested medication to help him with his previously-diagnosed ADHD symptoms.[6] Id. During her conversation with plaintiff,

---

[4] Exhibit 1 is presented in two parts. Citations to the second part are to the ECF pages.
[5] Exhibit 2 consists of plaintiff's psychology records. This exhibit is also not separately paginated, so all page numbers are to unnumbered pages.
[6] Dr. Hill's notes indicate that plaintiff asked for a "stimulant" medication. Plaintiff contends that he did not ask for a stimulant specifically, but asked for any type of medication to help treat his ADHD. See, e.g., Pl.'s Reply, Ex. 1 ¶ 9. This dispute of fact is immaterial, as the BOP treats all ADHD medications identically for purposes of prescription.

however, Dr. Hill concluded that plaintiff did not seem to be suffering from acute ADHD at the time. She came to this conclusion based on five factors: (1) plaintiff did not appear to have any "difficulties with his thought process or motor activity;" (2) plaintiff had no trouble remembering both recent and more remote events; (3) plaintiff had no difficulty concentrating or paying attention during the session; (4) plaintiff did not indicate that he had trouble focusing on any aspects of daily life other than studying; and (5) plaintiff had written down everything he wanted to discuss on a note pad. See Defs.' Mem., Ex. 8 ¶ 5. Based on these observations, as well as the fact that plaintiff's medical records contained no mention of recent struggles with ADHD, Hill concluded that plaintiff "did not have ADHD, or . . . if he did have ADHD, he had developed coping skills to effectively manage it." Id. ¶ 6.[7] Accordingly, she discussed additional coping mechanisms with plaintiff to help him continue to effectively deal with his symptoms.[8] Id. ¶ 7; Defs.' Mem., Ex. 2, at 14. Plaintiff was not receptive to these ideas, and "made clear that he felt stimulant medications were the only thing that could help." Defs.' Mem., Ex. 8 ¶ 8. Hill told plaintiff that, although she was unable to prescribe medication, he could return to her if he required additional psychological counseling. Id. ¶¶ 8-9.

On August 2, 2013, after meeting with Hill, plaintiff filed a BP-8 administrative remedy request challenging Petersburg's "refusal to treat [his] previously-diagnosed [ADHD] and "anxiety disorder condition." He stated that these conditions had caused him "great distress and hardship," leading to "days when [he] feel[s] as though [he] can barely function." Defs.' Mem., Ex. 3, at unnumbered page 2. On August 14, 2013, plaintiff's unit counselor responded to plaintiff's request. She informed plaintiff that she had spoken to Dr. Amy Boncher, the head of

---

[7] Indeed, the only reference to plaintiff's ADHD in his medical records from his time at Petersburg is a February 28, 2012 note from a mid-level practitioner noting that plaintiff had a history "of ADD without taking medication since he was 11 [years old]." Defs.' Mem, Ex. 1 cont., at 20.

[8] The use of these coping mechanisms, without success, is also a pre-requisite to the prescription of any medication for ADHD. See Defs.' Mem., Ex. 5, at unnumbered page 4.

5

Petersburg's psychology department. Boncher told plaintiff's counselor that she had reviewed Hill's notes, that she agreed with Hill's findings, and that plaintiff needed to meet many additional criteria before being prescribed any ADHD medication. Id. at unnumbered page 3; Defs. Mem., Ex. 7 (Boncher Aff.) ¶ 3. Plaintiff appealed his counselor's response to Warden Wilson on August 15, 2013. Wilson upheld the decision and encouraged plaintiff to speak with medical staff regarding any request for medication. Defs.' Mem., Ex. 3 at unnumbered pages 4-6.

On September 17, 2013, plaintiff appealed the Warden's response to the BOP's Regional Office. Id. at unnumbered pages 7-8. Defendant Eichenlaub, BOP's Regional Director, denied plaintiff's appeal on November 15, 2013, finding that plaintiff's treatment had been adequate. Id. at unnumbered page 10. Eichenlaub informed plaintiff that, if he wished to "re-start medication therapy," he should "send an electronic request to medical staff." Id. After receiving this message, plaintiff emailed Dr. Hill – not medical staff – requesting additional types of treatment for his ADHD on November 20, 2013. Defs.' Mem., Ex. 8 ¶ 10; Ex. B. Hill then decided that "there could be some value in administering a series of tests to [plaintiff] . . . While these tests on their own would not indicate the presence or absence of ADHD, they could indicate patterns to confirm the findings that [Hill] had already made from [her] review of [plaintiff's] records and the July 30 session." Id. ¶ 11. Hill hoped that these tests, once completed, "might provide additional evidence to persuade [plaintiff] that the types of coping skills [she had] earlier suggested were worth employing, if only as a trial methodology." Id. ¶ 12.

Hill emailed plaintiff on December 9, 2013, and told him that he would be scheduled for testing. See id. Ex. B. For unknown reasons, this testing was never completed. Plaintiff did not inquire again as to receiving medical tests, and did not contact Hill again for any other reason. See id. ¶¶ 15-17.

## II. Motion to Dismiss

### A. Standard of Review

6

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must presume that all factual allegations in the complaint are true, and must draw all reasonable inferences in the plaintiff's favor. See, e.g., Burbach Broadcasting Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002). Therefore, a court may not dismiss a complaint if the plaintiff pleads any plausible set of facts that would entitle him to relief. See, e.g., Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A claim has plausibility if the plaintiff alleges sufficient facts by which a court could reasonably infer the defendant's liability. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009 (citing Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007)). To meet this standard, however, the plaintiff must do more than simply allege "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." Id. (citing Twombly, 550 U.S. at 555)). Thus, the plaintiff must allege facts that show more than a "mere possibility of misconduct" by the defendant. Id. at 679.

B. Individual Capacity Claims Against Wilson, Samuels, Watts, Eichenlaub, Watts

To state a Bivens claim against a defendant, a plaintiff must show that "each government-official defendant, through [his] own actions, has violated the Constitution." Iqbal, 556 U.S. at 676. Thus, to be liable, a defendant must have played a personal role in the complained-of action. See, e.g., Danser v. Stansberry, 772 F.3d 340, 349 (4th Cir. 2014) (internal citations omitted). A supervisory official cannot be held liable on the basis of respondeat superior or the mere denial of an administrative grievance; he must also play a personal role in the complained-of action. See id. (citing Iqbal, 556 U.S. at 676).

On its face, plaintiff's complaint establishes that Samuels, Wilson, Watts, Laybourn, and Eichenlaub had no personal involvement in the complained-of actions. Plaintiff makes no specific allegations against Samuels, Watts, or Laybourn. None of these three individuals played any role in plaintiff's medical or psychological treatment. Accordingly, plaintiff has failed to state a claim against these defendants, and the claims against them must be dismissed. Similarly,

7

plaintiff alleges only that Wilson and Eichenlaub responded to his grievances regarding his ADHD treatment. As this Court has repeatedly held, a defendant's response to an administrative grievance is insufficient to hold that defendant personally liable. See Arnold v. Wilson, No. 1:13cv900, 2014 WL 7345755, at *8 (E. D. Va. Dec. 23, 2014) (citing Alder v. Corr. Med. Servs., 73 F. App'x 839, 841 (6th Cir. 2003)). Accordingly, the claims against Wilson and Eichenlaub must also be dismissed, leaving Drs. Hill and Boncher as the only remaining defendants in this civil action.

### III. Summary Judgment

#### A. Standard of Review

Summary judgment shall be granted if the evidence on file "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that judgment on the pleadings is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to point out the specific facts which create disputed factual issues. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences from the facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Material facts are those facts for which the moving party bears the burden of proof. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over facts that do not ultimately affect a party's burden of

proof on an element of a claim will not defeat a motion for summary judgment. An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Even where the nonmoving party is a pro se prisoner whose pleadings are entitled to liberal construction, a "declaration under oath . . . is not enough to defeat a motion for summary judgment. [The plaintiff] has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." Campbell-El v. Dist. of Columbia, 874 F. Supp. 403, 406-07 (D.D.C. 1994).

### B. Official Capacity Eighth Amendment Claims

#### *1. Legal Standard*

To prove that a deprivation of medical care violates the Eighth Amendment's prohibition of cruel and unusual punishment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Because "[t]he Constitution . . . does not mandate comfortable prisons," "only those deprivations denying the minimal civilized measures of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted). Therefore, to prove that prison officials acted with deliberate indifference to a serious medical need, a plaintiff must prove both that officials deprived[him] of an objectively serious medical need, and that the officials acted

9

with a subjectively culpable state of mind. See, e.g., De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Officials only act with a sufficiently culpable state of mind if they display "deliberate indifference . . . by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds by Farmer v. Brennan, 511 U.S. 825 (1994). In other words, a plaintiff must show that defendant's actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citations omitted). To act with deliberate indifference, a defendant must have actual knowledge of the potential risk of harm to an inmate; the mere fact that the defendant should have known of the risk is not sufficient to constitute deliberate indifference. See, e.g., Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it."). Accordingly, neither a claim of medical malpractice nor a disagreement between the inmate and the prison about the proper way to treat a medical condition amounts to a violation of the Eighth Amendment. See, e.g., Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

### 2. Analysis

The evidence shows that the defendants did not show deliberate indifference to plaintiff's serious medical needs. Assuming without deciding that plaintiff's ADHD constitutes a serious medical need, the evidence shows that Drs. Hill and Boncher provided adequate treatment for that need.

Plaintiff states that the defendants contest his assertion that he suffers from a serious medical need. This conclusion is incorrect. The defendants do not deny that, before being incarcerated at Petersburg, plaintiff suffered from ADHD. Defendants have shown, however, there is no evidence that, before plaintiff's 2012 visit with Dr. Hill, any of the defendants had any knowledge that plaintiff's ADHD symptoms were causing him distress. From 2006

through his visit with Dr. Hill, plaintiff asked only for medication to treat his anxiety and depression; he did not alert anyone at Petersburg that he was suffering from ADHD symptoms. To act with deliberate indifference, a defendant must intentionally disregard a known risk of serious harm. Medical officials are deliberately indifferent only if they "actually . . . recognize[] that [their] actions [are] insufficient" to protect plaintiff from a risk of harm. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (citing Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001)). Absent such actual knowledge that a plaintiff is at risk of serious harm, there is no Eighth Amendment violation. See, e.g., Rich v. Bruce, 129 F.3d 336, 340 (4th Cir. 1997).

In addition, it is clear that, even assuming that plaintiff suffered from a serious medical need, Petersburg officials provided plaintiff with sufficient medical treatment based on the information available to them at the time. Multiple medical professionals provided plaintiff with several different types of antidepressants, including fluoxetine, sertraline, and busiprone, during his time at Petersburg. Plaintiff met with mental health staff on a regular basis, and Dr. Hill attempted to provide him with treatment for his ADHD when he raised his concerns. Specifically, she educated him about coping skills and methods of treatment other than medication. When plaintiff continued to complain of his ADHD symptoms, she even offered to schedule plaintiff for testing. Despite plaintiff's statements to the contrary, the fact that he never received this testing is not evidence of deliberate indifference. Dr. Hill believed that the testing was not necessary to his treatment; indeed, she believed that he was already coping well with his ADHD and that any testing would have been an additional treatment option, beyond what she believed plaintiff required. As this decision was motivated by her professional judgment, it is not appropriate for the Court to second guess her decision. See, e.g., Neal v. Stanford, No. 7:10cv163, 2010 WL 1727464, at *2 (W.D. Va. Apr. 28, 2010) (internal citations omitted) ("The nurse, based on her medical expertise or on consultation with someone else in the medical unit, decided that missing one dose did not present any significant risk to Neal's health. The court

cannot second guess such medical judgments."). And, as Hill's treatment had already exceeded that which was constitutionally necessary, plaintiff not receiving the specific tests ordered does not violate the Eighth Amendment.

Plaintiff's argument essentially consists of a disagreement with Petersburg officials about his preferred method of ADHD treatment. Such an argument does not implicate the Eighth Amendment. See Wright, 766 F.2d at 849. Although plaintiff alleges that the defendants provided him with "no treatment," Pl.'s Reply, at 6, the evidence shows that the defendants did, in fact, provide him with adequate treatment. The mere fact that he was unable to receive the treatment of his choice does not render the defendants' conduct unconstitutional. See Hudson v. McMillian, 503 U.S. 1, 9 (1992)

Plaintiff's own submissions support this conclusion. In response to the defendants' Motion for Summary Judgment, plaintiff has provided only conclusory statements that the defendants provided inadequate treatment for his long-standing ADHD, supported only by quotations from his Pre-Sentence Report. These statements are insufficient to survive a Motion for Summary Judgment, as the defendants do not dispute that plaintiff had, prior to his incarceration, a diagnosis of ADHD. When plaintiff presented his diagnosis to defendants, however, Dr. Hill concluded that he was coping well with his condition. Indeed, plaintiff was able to write two books while incarcerated, earned his paralegal degree, and kept a prolific prison blog on the Internet. These accomplishments belie his contention that his ADHD is debilitating and unbearable. Although he has legal experience and legal knowledge, plaintiff has not provided any evidence to dispute the defendants' evidence; therefore, he has not met his burden of showing that his claims amount to something more than a mere disagreement over his medical care. Defendants' Motion for Summary Judgment must therefore be granted.

### C. Qualified Immunity on Individual Capacity Claims

Defendants Hill and Boncher, to the extent that they can be held liable in their personal capacity, also argue that, even if they did violate plaintiff's Eighth Amendment rights, they are entitled to qualified immunity. Under the qualified immunity doctrine, defendants performing discretionary functions and sued in their individual capacity "are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court considering a qualified immunity defense must make two inquiries: (1) whether the facts, when viewed in the light most favorable to the plaintiff, establish that the defendants committed a constitutional violation; and (2) whether such a right was clearly established at the time of the defendant's conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). A court does not need to address these inquiries in any particular order, and a defendant is entitled to qualified immunity if the court resolves either element in favor of the defendant. Pearson v. Callahan, 555 U.S. 223, 225 (2009).

The evidence shows that the defendants did not violate plaintiff's Eighth Amendment rights. Even if they had, however, it is clear that they did not violate any of plaintiff's "clearly established" rights. The threshold inquiry for determining whether a right was clearly established at the time of the defendants' conduct is whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Specifically, if individuals could reasonably disagree about whether a particular action was unconstitutional, a defendant is entitled to qualified immunity. See, e.g., Malley v. Briggs, 475 U.S. 225, 341 (1986). This is so because qualified immunity "ensures that [defendants] are liable only for transgressing bright lines," not for making "bad guesses in gray areas." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (citing Anderson, 483 U.S. at 635). Determining whether a particular right is clearly established requires a contextual and particularized examination of the application of the constitutional provision to the

13

specific facts in issue. See, e.g., Brosseau v. Haugen, 543 U.S. 194, 200 (2004); Saucier, 533 U.S. at 202.

The Eighth Amendment requires defendants to provide adequate medical care to incarcerated plaintiffs. See, e.g., Wilson, 501 U.S. at 106. The Eighth Amendment does not require defendants to provide prisoners with the medical care of their choice, nor does it require officials to give inmates "unqualified access to health care". Hudson, 503 U.S. at 9. As described above, the evidence shows that, faced with plaintiff's specific symptoms, as well as BOP policy limiting the prescription of ADHD medication, Dr. Hill provided plaintiff with constitutionally adequate medical care. She examined plaintiff, spoke with him, and even offered to provide him with testing. As these activities went beyond the minimum required by the Constitution and were consistent with BOP policy, they did not violate any clearly established right. Hill is therefore entitled to qualified immunity.

To the extent that Boncher can be found to have played any personal role in plaintiff's treatment, she is also entitled to qualified immunity. When considering plaintiff's BP-8, she reviewed Hill's treatment of plaintiff, examined plaintiff's medical records, and concluded that he had received adequate treatment. These actions were consistent with her role as a supervisor, and were well within the bounds of the Constitution. Accordingly, she did not violate any "clearly established" right, and she is also entitled to qualified immunity.

### IV. Rehabilitation Act

Plaintiff also alleges that the defendants discriminated against him on the basis of his disability, in violation of the Rehabilitation Act, Pub. L. No. 93-112, 87 Stat. 355, 29 U.S.C. § 791 et seq. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or any program or activity conducted by any Executive Agency . . . ."

14

29 U.S.C. § 794(a). Because plaintiff has failed to exhaust his administrative remedies for this claim, it must be dismissed.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The U.S. Supreme Court has explicitly stated that "the [§ 1997e(a)] exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper" exhaustion requires "'using all the steps that the agency holds out and doing so . . . so that the agency addresses the issues on the merits.'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002), cert. denied, 537 U.S. 949 (2002)). Exhaustion of administrative remedies before filing any action challenging prison conditions is therefore mandatory, even if the exhaustion process cannot provide prisoner with the relief he seeks. See, e.g., Booth v. Churner, 532 U.S. 731, 741 n.6 (2001); Woodford, 548 U.S. at 86. Lawsuits subject to this requirement involve actions challenging any aspect of prison life, "whether they involve general circumstances or particular episodes," and thus include actions raising Rehabilitation Act claims. Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Haley v. Haynes, No. CV210-122, 2012 WL 112946, at *1 (S.D. Ga. Jan. 12, 2012) ("[T]he very language of 42 U.S.C. § 1997e(a) requires a prisoner to exhaust all available administrative remedies before he can bring a cause of action pursuant to . . . [any Federal law], which would include the [Rehabilitation Act].").

Additionally, courts have found that, before filing any action challenging prison conditions, an inmate must exhaust all remedies, even those "external" to the prison system. William G. v. Pataki, No, 03 Civ. 8331 (RCC), 2005 WL 1949509, at *4 (S.D.N.Y Aug. 12, 2005). "External" remedies include internal DOJ administrative processes, even if the administrative remedy process would not be mandated for non-incarcerated individuals. See Trevino v.

15

Woodbury Cnty. Jail, No. C14-4051-MWB, 2015 WL 2254931, at *6 n.5, appealed, No. 15-2179 (8th Cir. May 29, 2015) (internal citations omitted) ("While exhaustion of the DOJ remedy is not a prerequisite to a private right of action for non-prisoners under the [Americans With Disabilities Act], the PLRA imposes such an exhaustion requirement on prisoners.")

Here, it is undisputed that plaintiff exhausted his remedies within the BOP; however, he did not exhaust his administrative remedies under the Department of Justice's ("DOJ's") regulations pertaining to claims of discrimination, 28 C.F.R. § 39.170. These regulations govern the administrative process surrounding "allegations of discrimination on the basis of handicap in programs or activities conducted by the agency." 28 C.F.R. § 39.170(a). The process involves a multi-layered review of a plaintiff's initial complaint, including an attempt at informal resolution and an administrative hearing, if necessary. See id. §§ 39.170(d)-(k). Although the process itself is not mandatory under DOJ policy, see id. § 39.170(d)(1) (any person aggrieved "may file a complaint"), it "give[s] corrections officials the opportunity to address claims that they are not complying with the . . . Rehabilitation Act before being forced to litigate the matter in federal court," William G., 2005 WL 1949509, at *5. As the PLRA was passed for this very purpose – to give prison officials a chance to review claims before the filing of a lawsuit – the process is mandatory for prisoners under the PLRA. Porter, 534 U.S. at 523.

Because plaintiff did not exhaust his remedies under DOJ's administrative process, he has not exhausted his Rehabilitation Act claim. This claim accordingly must be dismissed.

### V. Motion to Stay

On June 29, 2015, plaintiff filed a "Motion to Stay Ruling and for Order Allowing Prisoner to Prisoner Communication." Dkt. No. 35. In this motion, plaintiff states that he intends to file a sur-reply to the defendant's recently-filed reply memorandum, disputing the defendants' "claim that Plaintiff has not demonstrated that he suffers from a 'Serious Medical Need.'" Mot. to Stay ¶ 2. This request must be denied, for several reasons. First, as discussed above, the defendants

have not disputed that plaintiff's ADHD constitutes a serious medical need. Defendants also do not dispute that, at some point in the past, plaintiff suffered from ADHD. The defendants have shown only that, to the extent that plaintiff currently suffers from ADHD, they had no knowledge of his current symptoms. Any attempt to present evidence of plaintiff's past ADHD is therefore irrelevant to this action.[9] Second, to the extent that plaintiff requests an extension of time to submit a sur-reply, he is not entitled to such an extension. Local Rule 7(F)(1) states that, after service of a moving party's brief, the opposition's response, and the moving party's rebuttal, "no further briefs or written communications may be filed without first obtaining leave of court." Accordingly, plaintiff is not entitled to file a reply to the defendants' response. He is therefore not entitled to an extension of time to do so.

Plaintiff states that, in his sur-reply, he "intends to supply the supplemental affidavit of . . . a former BOP official in order to clarify the importance of the Pre-Sentence Report in all aspects of BOP dealing with inmates . . . ." Mot. to Stay ¶¶ 3. He states that he has been delayed in filing his sur-reply due to his inability to communicate with another federal inmate at another federal facility. Id. ¶ 4. Although he does not explain why communication with this inmate is necessary, he states that he "has attempted to obtain the permission of BOP administration in order to communicate with [the inmate]," but has been denied. Id. ¶ 4. He now requests that the Court "issue an order requiring the Defendants to allow communication between Plaintiff and [the inmate] for the purposes of obtaining the supplemental affidavit." Id. Plaintiff also requests that this Court enter an Order staying this case until he is able to complete his reply.

To the extent plaintiff wishes this Court to order the BOP to take a specific action, his request is denied. The BOP has the right to exercise its discretion in the day-to-day maintenance

---

[9] Even if the defendants had contested the fact that plaintiff suffers from a serious medical need, the evidence shows that they did not act with deliberate indifference to that need. Accordingly, plaintiff's contention is not relevant to the outcome of this action.

17

of its facilities, and this Court will not interfere with that discretion, absent extraordinary circumstances. In addition, as discussed above, plaintiff's request to include additional information regarding his Pre-Sentence Report would be irrelevant to this action. Therefore, his request for an extension of time to obtain an affidavit from a former BOP official must be denied.

Plaintiff last states that he "is currently drafting discovery relevant to the disputed issues of material fact. The discoverable issues that Plaintiff intends to probe include . . . the Defendants [sic] use of the Pre-Sentence Report . . . , the communication between Psychological Services and Health Services relating to the Plaintiff's ADHD diagnosis and treatment (or lack thereof), and the Defendants' continual referral to a statement never made by Plaintiff – that he was seeking 'stimulant medication.'" Mot. to Stay ¶ 5. For reasons stated in this Opinion, none of these issues are relevant to the issues remaining in this action. Accordingly, plaintiff's Motion must be denied.

## VI. Conclusion

For the foregoing reasons, plaintiff's Motion to Stay Ruling and for Order Allowing Prisoner to Prisoner Communication is denied. Defendants' Motion for Summary Judgment will be granted. An appropriate Judgment and Order shall issue.

Entered this 2nd day of July 2015.

/s/
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia